**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ROBERTA SCHALIT,**

                      Plaintiff,

      - against -

**CIGNA LIFE INSURANCE**
**COMPANY OF NEW YORK,**

                  Defendants.

**Civil Action No.**
**1:07-cv-476 (CM)(RLE)**

**AMENDED COMPLAINT**

---

Plaintiff, Roberta Schalit, by her attorneys, Law Offices of Jeffrey Delott, for her amended complaint against the defendants CIGNA Life Insurance Company of New York ("CIGNA"), alleges as follows:

## JURISDICTION, VENUE & STANDARD OF REVIEW

1.     Jurisdiction of the Court is based upon 28 U.S.C. § 1332, which give the District Courts jurisdiction to hear civil actions between citizens of different states, and the amount in controversy exceeds $75,000.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, which allows an action in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject

to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

## NATURE OF ACTION

3       Plaintiff seeks to recover long term disability ("LTD") income benefits pursuant to the terms and conditions of a group insurance contract, NYK-030042 (the "Policy").

4.       Prior to and including October 10, 2002, Plaintiff was employed by the Union of American Hebrew Congregations (the "Employer") as Associate Director of ARZA/World Union, N.A.  The Employer purchased the Policy to cover its Rabbis, Cantors and select upper level executive management, including Plaintiff.

## THE PARTIES

5.       Plaintiff was born on November 17, 1953, is presently 54 years old, and is a resident of Vermont.

6.       Defendant CIGNA is a business organization licensed to conduct the business of insurance in the State of New York.

**BASIC POLICY TERMS**

7.      INA Life Insurance Company of New York ("INA")) issued the Policy to the "Trustees of the Reform Pension Board Trust."  A 1999 name change endorsement states that CIGNA replaced INA in the Policy.


8.      The Policy provides for payment of monthly income benefits to participants who become disabled.  The Policy provides disability benefits if the employee is "unable to perform all the material duties of your regular occupation".  After 24 months of receiving benefits, an employee must be "unable to perform all the material duties of any occupation for which you may reasonably become qualified based on education, training or experience."


9.      The monthly benefit under the Policy is based on 60% of the employee's monthly "Covered Earnings," which is increased by an annual cost of living adjustment and reduced by "Other Income Benefits," as those terms are defined in the Policy.  However, increases in Other Income Benefits are not supposed to reduce the monthly benefit.  The maximum benefit period under the Policy for a disability that began prior to age 61 is to age 65.


**VOCATIONAL BACKGROUND**

10.      After graduating from Hofstra Law School in 1978, Plaintiff and her husband spent the next twenty years working together as partners in their own law firm and real estate management company.  Plaintiff worked for her entire life, nearly 25 years, before applying for benefits under the Policy.

11.     In 1995, Plaintiff began volunteering for ARZA/World Union, N.A., an affiliate of the Employer, and was employed by the latter the following year.  Plaintiff received a series of promotions from New York Regional Director, to National Director, to Assistant Director, and finally to Associate Director, where she earned an annual salary of $92,500.  As an Associate Director, Plaintiff was required to sit for at least six hours a day, to be on her feet for a couple of hours a day, and to maintain concentration and attention to detail while completing many tasks simultaneously.  Plaintiff was also responsible for performing many of the tasks of a Non Profit Executive Director as set forth in the Dictionary of Occupational Titles, 195.117-010.

12.     Plaintiff, who in December 2001 had multiple laminectomies, was forced to stop working in May of 2002 because of her progressively worsening back condition.  However, because Plaintiff loved her job and was committed to continuing her career, she tried returning to work on September 3, 2002.  Despite her best efforts, Plaintiff was only able to work until October 10, 2002, which CIGNA determined was her disability onset date.

## SOCIAL SECURITY

13.     On December 23, 2004, the Social Security Administration (the "SSA") concluded that Plaintiff was totally disabled as of May 31, 2002 – not October 10, 2002.  Plaintiff's monthly Social Security Disability ("SSD") benefit was $1,645.00 with an additional $822.00 a month for her minor child, for a total monthly family benefit of $2,467.  When Plaintiff's youngest child turned 18 on June 16, 2005, the auxiliary benefit payments ceased.

14.     The SSA determined that Plaintiff's impairments were so severe that she was unable to perform her past work with the Employer, as well as **any** type of substantial gainful work.  Plaintiff's condition was so obviously disabling that she was awarded SSD benefits both retroactively and prospectively without even having to proceed to an administrative hearing.

15.     Annual cost of living adjustments ("COLA") increased Plaintiff's monthly benefits from the SSA.  SSA benefits constituted Other Income Benefits under the Policy, which Plaintiff was required to repay.  Increases in Other Income Benefits are not supposed to reduce the LTD monthly benefit under the Policy.  Nonetheless, after receiving benefits from the SSA, Defendant required Plaintiff to repay Defendant for COLA increases in SSA benefits, as well as SSA benefits awarded retroactively..

16.     CIGNA accepted the SSA decision without question in order to compel Plaintiff to repay SSA benefits to CIGNA, including the COLA increases, which should not have been repaid under the terms of the Policy.  However, CIGNA subsequently rejected the SSA decision without question when it decided to terminate Plaintiff's LTD benefits.

## PRE-TERMINATION MEDICAL EVIDENCE

17.     On December 6, 2001, Dr. Michael Lavyne, a board certified neurosurgeon, performed multiple laminectomies on Plaintiff, and also removed a cyst

that was growing on her spine.  Plaintiff subsequently returned to work for about a
month, but her condition did not improve after the surgery.

18.     On August 5, 2002, Dr. Lavyne stated that Plaintiff had been totally
disabled and unable to do any prolonged sitting since her surgery.

19.     On October 25, 2002, after receiving Plaintiff's application for LTD
benefits, CIGNA asked Dr. Lavyne for medical information.  In doing so, CIGNA
immediately threatened to deny the claim for lack of cooperation if the information was
not completed for lack of cooperation.

20.     On May 19, 2003, Dr. Lavyne advised CIGNA that Plaintiff had
chronic disabling low back pain and that she remained 100% disabled.  Dr. Lavyne
added that Plaintiff could not even do sedentary work because of the combination of her
persistent pain and the effects of her medications.

21.     On June 13, 2003, CIGNA asked Dr. Lavyne for yet more medical
information.  Dr. Lavyne reiterated that Plaintiff had chronic back pain, a poor prognosis,
could not do any prolonged sitting, and would remain 100% disabled for an indefinite
period of time.

22.     CIGNA asked a nurse named Lisa Scotton to review Dr. Lavyne's
reports.  Ms. Scotton said Plaintiff's symptoms supported the diagnosis of chronic low

back pain.  Ms. Scotton determined that Dr. Layne's functional assessment supported

Plaintiff's claim, so she sent the matter to Joseph T. Doyle, CIGNA's Associate Medical

Director, to see if he could offer grounds to deny the claim.  Dr. Doyle's review was

limited to a single handwritten sentence, to get "DOT and/or JD".[1]


23.     On July 3, 2003, Dr. Doyle concluded that Plaintiff lacked the

functional capacity to work at her occupation.  Based on Dr. Doyle's conclusion, on July

8, 2003, Ellen Penny of CIGNA approved payment of Plaintiff's LTD benefits.  However,

Ms. Penny said to follow up on Plaintiff's claim the following month to see if she has

improved.  Thus, upon approving Plaintiff's benefits, CIGNA was already trying to

develop a basis to terminate them.


24.     Recognizing that Plaintiff's functional capacity had to improve in

order for her LTD benefits to be terminated, on November 15, 2003, CIGNA noted that it

needed to follow up with Dr. Lavyne to see if Plaintiff's condition had improved.


25      On September 21, 2004, CIGNA's Kari O'Connor returned

Plaintiff's claim file because her office could make "no impact" prior to the start of

Plaintiff's so-called "Any Occupation Period, " which began October 10, 2004.  As of

October 10, 2004, Plaintiff would have to prove that she could not perform any type of

work, not only her past work.  Ms. O'Connor's statement that, "No impact can be made

prior to A/O start date of 10/10/04," is an admission that CIGNA lacked a basis to

terminate Plaintiff's benefits during her own occupation period.  When Plaintiff inquired

---

[1] The "DOT" refers to the Dictionary of Occupational Titles.  "JD" refers to Job Description.

about Ms. O'Connor's statement, CIGNA responded, "See Acclaim for details," which is CIGNA's documentation system for disability claims.  However, neither "Acclaim" nor any other document CIGNA produced provided any information about Ms. O'Connor's statement, and CIGNA refused to offer an explanation for her statement.

26.     For several months, CIGNA was confused about whose claim it was processing and the date the claim's disability definition transitioned from the "own occupation" period to the "any occupation" period.  CIGNA thought that it was processing a claim for Plaintiff's husband, Robert Schalit.  For example, on November 11, 2004, Robert Ray of CIGNA informed "Robert" Schalit that the "any occupation period" was approaching, which contradicts Ms. O'Connor's statement that October 10, 2004 represented the start date.  Similarly, on November 18, 2004, Scott Harvey of CIGNA stated that Plaintiff's "any occupation period" commenced April 8, 2005.

27.     On December 23, 2004, a United States Administrative Law Judge ("ALJ") approved Plaintiff's SSD benefits without the need for a hearing.  The ALJ found that Plaintiff had been totally disabled and unable to perform **any** occupation as of May 2002.  CIGNA relied on ALJ's finding that Plaintiff was totally disabled from any occupation in order to reduce her monthly LTD benefit by approximately $2,541, and to demand that Plaintiff refund it.  CIGNA then completely ignored the ALJ's determination when deciding to terminate Plaintiff's LTD benefit.

28.     CIGNA solicited and paid a company called Advantage 2000 Consultants to handle Plaintiff's SSD claim.  Incredibly, CIGNA claims that it had no ability to gain access to Plaintiff's SSD file from any source, including Advantage and the attorneys who handled that matter.[2]

29.     On February 24, 2005, CIGNA learned that it had been sending its forms to Robert Schalit instead of Roberta Schalit.

30.     On February 25, 2005, the Reform Pension Board (the "RFB"), the entity that administered Plaintiff's pension, told CIGNA that it was responsible for paying 15% of Plaintiff's pension continuation, which equaled $1,150.86 a month, retroactive to the date that her disability benefits began.  About a week later, in an internal CIGNA document dated March 11, 2005, Mr. Harvey stated that he planned to deny Plaintiff's claim.

31.     On April 4, 2005, CIGNA spoke with Plaintiff, who repeated that her pain prevented her from sustained sitting or standing.  That same date, Dr. Keith Michl, who had been providing Plaintiff's pain management, completed CIGNA's Physical Abilities Assessment form ("PAA").  Dr. Michl checked the box that indicated Plaintiff could sit somewhere between 2.5 and 5.5 hours a day.  CIGNA never asked its vocational consultant, Gregg Schwarzkopf, if Plaintiff could perform sedentary work if limited to sitting for no more than 5.5 hours a day.  More importantly, **Dr. Michl later**

---

[2]   Scott Anderson of CIGNA told Plaintiff that CIGNA could get the file and that CIGNA would provide it to her.

**specified that when he checked the box that indicated Plaintiff could sit somewhere between 2.5 and 5.5 hours a day, it was his opinion that she was only able to sit for approximately 3 hours a day.**

32.     On May 17, 2005, Mr. Harvey met with CIGNA's nurse, Jane Young, to review Dr. Michl's PAA.  CIGNA did not have a vocational consultant review the PAA.  Despite the fact that Ms. Young is not a vocational expert, she advised Mr. Harvey that the PAA showed that Plaintiff could do sedentary work, even though according to vocational experts sedentary requires the ability to sit for more than 5.5 hours a day.

**THE TERMINATION**

33.     In a letter dated May 25, 2005, Mr. Harvey terminated Plaintiff's LTD benefits based on Dr. Michl's PAA and Plaintiff's Disability Questionnaire.  Despite Dr. Michl's PAA which provided Plaintiff could not sit for the requisite 6 hours a day, Mr. Harvey claimed that Plaintiff's back condition was not severe enough to show that she was unable to work at her regular occupation.  CIGNA terminated Plaintiff's benefits as of May 23, 2005.

34.     According to CIGNA's records, which are inconsistent, the latest date when Plaintiff's "Any Occupation Period" would have started is April 8, 2005.  Therefore, CIGNA paid Plaintiff's long term disability benefits throughout the entire

duration of her own occupation period, and then for nearly two months during her "Any Occupation Period".

35.    If Plaintiff's benefits were terminated based upon a finding that she could resume her regular occupation, then "regular occupation" is the usual work that Plaintiff actually performed immediately before the onset of her disability,[3] which required non-sedentary tasks, such as "extensive" traveling, that Dr. Doyle noted Plaintiff was required to do.

36.    If Plaintiff's benefits were terminated based upon a finding that she could perform any other sedentary occupation, then that means CIGNA terminated Plaintiff's benefits based upon Nurse Young's interpretation of Dr. Michl's PAA, even though Dr. Michl concluded that Plaintiff's back condition never improved to a sedentary functional capacity where she could sit for more than **3 hours a day, let alone at least 6 hours per day, as required by the DOT**.

37.    CIGNA's termination letter specifically stated that Dr. Michl's PAA "does not indicate any restrictions or limitations that would keep you from performing your occupation."  However, the PAA form's check-off box vaguely indicated that Plaintiff could only sit between 2.5 and 5.5 hours a day, and sedentary work requires the ability to sit for at least 6 hours day.

---

[3] *See e.g., Lasser v. Reliance Standard Life Ins. Co.,* 146 F.Supp.2d 619 (D.N.J. 2001), *affirmed* 344 F.3d 381 (3rd Cir. 2003), *cert. denied,* 541 U.S. 1063 (2004).

## POST-TERMINATION MEDICAL EVIDENCE

38.     CIGNA's termination letter ignored all of the evidence that Plaintiff submitted regarding her pain and the adverse effects of her pain medication, and the medical records submitted after CIGNA's termination echoed those limitations.

39.     Dr. Michl's treatment reports from June 8, 2005 and October 19, 2005 state that Plaintiff's severe somnolence and being bed ridden resulted from her taking methadone, which was subsequently replaced by morphine, whose side effects are even more severe.

40.     CIGNA selectively accepted the evidence that supported terminating benefits, but rejected the evidence that supported maintaining benefits. CIGNA's termination letter cited selective snippets from Dr. Michl's January 6, 2005 notes to justify terminating Plaintiff's benefits, **yet ignored that note's conclusion that Plaintiff could not even sit for 2.5 hours a day by that time.**  Furthermore, CIGNA ignored that the January 6, 2005 report also stated that Plaintiff was sleepy all the time and felt like a zombie because of the methadone.  While CIGNA states that the notes mention Plaintiff traveled to New York, CIGNA concealed the fact that Dr. Michl commented that Plaintiff had to spend three (3) days in bed to recover from that trip.

41.     CIGNA also completely disregarded Plaintiff's letter dated August 31, 2005.  That letter states that Plaintiff's back condition causes her such severe pain that it interferes with her ability to focus and concentrate, and that when she takes pain

medications to alleviate her pain it compromises her cognitive ability by making her drowsy and fatigued.


## INITIAL APPEAL DENIAL

42.    On November 2, 2005, CIGNA denied Plaintiff's appeal.  The denial letter referenced Dr. Michl's records, which included his June 8, 2005 conclusion that Plaintiff was incapable of sitting for more than 2.5 hours a day and was heavily sedated from methadone.


43.    CIGNA admitted that the medical records established that Plaintiff was experiencing pain and fatigue, but CIGNA rejected Plaintiff's medical evidence on the grounds that they did not explain the cause, the etiology of her complaints.


44.    There is no provision in the Policy that requires a claimant, such as Plaintiff, to establish the cause of her pain or fatigue.


45.    By requiring Plaintiff to prove the etiology of her pain and fatigue, Defendant acted in bad faith by adding a term to the Policy and by changing the definition of disabled.


46.    Although Plaintiff was not required to prove the etiology of her pain, she did explain that her back condition, including severe spinal stenosis, was the cause.

47.     CIGNA turned a blind eye to the fact that Plaintiff's doctor prescribed Morphine, as well as Methadone, Topamax, Imitrex, Epidurals, Duragesic patches, Neurontin, Lexapro, Temazepam, Hydrocodone, Naproxyn, Nortriptyline, and Ambien, which evidences the severity of Plaintiff's pain.

48.     Although Plaintiff was not required to prove the etiology of her fatigue, she explained that her medications and wearing effects of her back condition were the cause.

49.     CIGNA disregarded the fact that Plaintiff's medications are well known to cause fatigue and that Dr. Michl repeatedly specified that Plaintiff's fatigue was caused by her use of her medications.

## FINAL APPEAL

50.     In her final appeal, Plaintiff provided evidence of the etiology and severity of her pain condition.

## The MRI Reports

51.     Plaintiff submitted a post-operative lumbar MRI of December 7, 2005 Lumbar MRI to CIGNA, which revealed that Plaintiff had moderate disc space narrowing, desiccation and annular bulging that is compressing the thecal sac at the L2-3 level.  At the L3-4 and L4-5 levels, where the laminectomy took place, the MRI

showed disc desiccation and annular bulging with facet joint hypertrophy[4] resulting in moderate foraminal compromise.  Finally, at the L5-S1 level, the MRI also revealed disc desiccation and pressure upon the thecal sac.

52.     Plaintiff also submitted an MRI of her thoracic spine that revealed degenerative changes in the mid to lower spine as well as chronic compression deformities at the T8 and T9 levels.

**Dr. Michl's Reports**

53.     Perhaps most importantly, Plaintiff submitted a report from Dr. Michl, which specified that at the time when he checked the box in the PAA that indicated Plaintiff could sit somewhere between 2.5 and 5.5 hours a day, **that it was his opinion that Plaintiff was only able to sit for approximately 3 hours a day – not 5.5 hours a day.**

54.     Even if Dr. Michl had concluded that Plaintiff were able to sit for up to 5.5 hours day, instead of 3 hours a day, that would still be insufficient for her to perform her regulation occupation according to the DOT.

55.     CIGNA rejected Dr. Michl's opinion in bad faith.  **CIGNA offered no explanation why it was willing to accept Dr. Michl's opinion that Plaintiff was able**

---

[4] According to *Harrison's Principles of Internal Medicine* at p. 78 (John W. Engstrom, et al., eds., 14th ed.1998), facet hypertrophy can cause radicular pain.

**to sit 5.5 hours a day when CIGNA thought it could serve as the basis to terminate Plaintiff's benefits, but was unwilling to accept Dr. Michl's opinion that Plaintiff was able to sit 3 hours a day when CIGNA knew it could not serve as the basis to terminate Plaintiff's benefits.**

56.   CIGNA knew or recklessly disregarded that Dr. Michl's PAA shows Plaintiff lacked the functional capacity to perform sedentary work.

57.   Dr. Michl's PAA shows that Plaintiff's back condition was severe enough to prevent her from doing her regular occupation.

58.   Dr. Michl's PAA shows that Plaintiff's restrictions and limitations prevent her from performing any other occupation as well as her regular occupation.

59.   In the most recent medical records of Dr. Michl that were submitted to CIGNA, he concluded that Plaintiff is incapable of sitting for more than 2.5 hours a day and is heavily sedated from her pain medication.

60.   CIGNA knew, but in bad faith ignored, that Dr. Michl's records showed that Plaintiff's condition has gotten worse, not better, since the time CIGNA approved her LTD benefits.

**Dr. Lesniewski's Report**

61.     Plaintiff provided CIGNA with a narrative report from Dr. Peter Lesniewski, a board certified orthopedic surgeon.  Dr. Lesniewski, who examined Plaintiff on April 26, 2006, noted that an EMG/NCS revealed "significant neural damage".  Dr. Lesniewski stated that the MRI reports showed, among other things, stenosis and foraminal narrowing at the L2/3/4/5/ and S1 levels.  His examination revealed a complete absence of ankle jerks, which reflects a pinched or inflamed S1 nerve root.  Dr. Lesniewski's diagnostic impression was foraminal stenosis.  Dr. Lesniewski emphatically concluded that Plaintiff is disabled.  Dr. Lesniewski added that Plaintiff would remain disabled even after she undergoes additional surgery that she needs.

**Dr. Stein's Report**

62.     Plaintiff provided CIGNA with a narrative report from Dr. Bruce Stein, who specializes in arthritis and rheumatology.  Dr. Stein examined Plaintiff on April 25, 2006, and found that she had positive bilateral straight leg raises, which indicates the presence of nerve irritation in the sciatic nerve.  Dr. Stein concluded that Plaintiff has severe chronic lower back pain that radiates down her legs.  He specified that Plaintiff is unable to sit for more than an hour a day, and that in his opinion Plaintiff is unable to work.

63.     Four different specialists, all of who examined Plaintiff, Dr. Lavyne, Dr. Michl, Dr. Lesniewski and Dr. Stein, each concluded that Plaintiff's condition is severe enough to render her completely disabled from performing any type of work on a sustained basis.

64.     Even CIGNA's own Associate Medical Director, Dr. Doyle, concluded that Plaintiff cannot work.

## THE VOCATIONAL EXPERT'S REPORT

65.     Plaintiff also provided CIGNA with a narrative report from a vocational expert named Amy Peiser Leopold, whose background includes having worked for a disability insurer for over a decade as one of its vocational rehabilitation consultants.

66.     Ms. Leopold chronicled that Plaintiff takes numerous medications on a regular basis that leave her exhausted, light headed, dizzy, with fogginess, memory loss, inability to concentrate and a suppressed appetite.  The vocational report notes that Plaintiff has lost 30 pounds in the prior year and weighs only 125 pounds at 5 feet 6 inches tall.  Ms. Leopold pointed out that Plaintiff suffers from frequent falls due to imbalance and leg weakness.

67.     The vocational report provided support for Plaintiff's subjective complaints by pointing out that Plaintiff was earning nearly a $100,000 annually from her work, which she loved, and that her attempt to return to her work, which lasted about a month, resulted in her losing five months of LTD benefits.

68.     Ms. Leopold concluded that Plaintiff's position as Associate Director required her to be able "to sit for at least six hours per day in order to complete the essential functions of her position."  There is no vocational evidence that contradicts that opinion, nor can there be since sedentary work requires the ability to sit for at least 6 hours a day.

69.     Ms. Leopold stated that because Plaintiff "is unable to sit for six hours per day," she is unable to perform any sedentary work in accordance with the definition of sedentary work from the United States Department of Labor's Dictionary of Occupational Titles.

70.     Ms. Leopold emphasized that her conclusions are corroborated by the SSA's award of disability benefits, which required finding that Plaintiff is incapable of performing any type of sedentary work on a sustained basis.

71.     Ms. Leopold concluded "that Ms. Schalit has remained disabled from her occupation due to her extensive restrictions and limitations, the significant

amount of pain medication she continues to take on a daily basis, and the side effects they produce."

## CIGNA WITHHELD INFORMATION

72.     Plaintiff repeatedly asked CIGNA to provide information to make it possible to understand the documents that were produced as Plaintiff's claim file, but CIGNA refused to provide most of the information that Plaintiff requested.

73.     Plaintiff repeatedly asked CIGNA to provide "relevant" documents, as that term is defined under ERISA, which requests CIGNA either rejected or ignored.

74.     Plaintiff repeatedly asked CIGNA to identify what additional information it deemed necessary in order to reinstate her benefits, but CIGNA acted in bad faith by refusing to do so.

75.     CIGNA failed to request any additional information from Plaintiff, and it failed to identify any additional information it believed was necessary for Plaintiff to establish her claim.

## CIGNA UPHELD THE TERMINATION

76.     By letter dated July 27, 2006, CIGNA upheld its decision to terminate Plaintiff's LTD benefits.  Disregarding all of the medical and vocational evidence that supported Plaintiff's disability claim, CIGNA asserted that a review by a

medical director, Scott C. Taylor, an osteopath who never examined Plaintiff, showed that Plaintiff failed to provide evidence that she was unable to perform her sedentary occupation.

77.     Since CIGNA claimed that Plaintiff's occupation was sedentary, and since it determined that Plaintiff was unable to do her sedentary work and paid her benefits for over two years, CIGNA had to show that Plaintiff's condition had improved. However, CIGNA failed to identify a single piece of medical evidence showing that Plaintiff's condition improved, and the evidence submitted from Drs. Michl, Lesniewski and Stein showed that her condition had gotten worse.

78.     Dr. Taylor said that Dr. Michl's PAA indicated Plaintiff could perform sedentary work because Plaintiff could do "frequent" sitting.

79.     Sedentary work requires "constant" sitting, which is in excess of "frequent" sitting.

80.     CIGNA acted in bad faith by accepting Dr. Taylor's conclusion that Plaintiff could perform sedentary work because she could do "frequent" sitting.

81.     Dr. Taylor's report is reprehensibly biased.  His report states that Plaintiff failed to provide any new clinical or diagnostic testing to review.  The reports of Dr. Lesniewski, Dr. Stein, and the latest report of Dr. Michl clarifying that Plaintiff was

never able to sit for more than 3 hours a day, show that the purpose of Dr. Taylor's report was merely to serve as a perfunctory medical opinion designed to support a predetermined result.  Moreover, Dr. Taylor conveniently omitted that Dr. Stein concluded Plaintiff was limited to sitting for 1 hour day, and that selectivity further evidences Dr. Taylor's obvious bias.  Dr. Taylor's report also conveniently failed to indicate any medical evidence that showed Plaintiff's condition had improved.

82.     Just as it failed to do when reviewing Plaintiff's initial appeal, in conducting its subsequent appeal CIGNA also failed to have a vocational expert address whether Plaintiff could perform sedentary work if limited to sitting to 1 hour, as Dr. Stein concluded, or 2.5 hours, as Dr. Michl concluded, or even 5.5 hours, if arbitrarily construing the checkmark in the box in Dr. Michl's PAA as unfavorably as possible.

83.     CIGNA acted in bad faith by failing to ask a vocational expert whether Plaintiff could perform sedentary work if limited to sitting 1 hour, as Dr. Stein concluded, or 2.5 hours, as Dr. Michl concluded, or even 5.5 hours, because CIGNA knew the answer was no.

## March 7, 2008 Conference

84.     During the Court's March 7, 2008 conference, the parties agreed that ERISA would not apply to Plaintiff's claims.  Because review would not be limited to the "administrative record," facts postdating CIGNA's final decision are relevant.

85.     Plaintiff underwent two additional and simultaneous major back surgeries on or about January 25, 2007.  The intent of these procedures was to materially reduce Plaintiff's enduring chronic back pain and to end her disability.

86.     The first of these two surgeries, approaching the spine from Plaintiff's anterior, removed lumbar discs from Plaintiff's spine and replaced them with interverterbrial spacers filled with bone and tissue grafted from Plaintiff's pelvis, in a manner to encourage the eventual growth of a solid cage of bone around Plaintiff's lumbar spine.

87.     The second surgery that day, by which the surgeon approached Plaintiff's spine from behind, consisted of two parts:  The first part was to perform several laminectomies, routing out the open column in the stacked vertebrae in which the spinal cord is positioned, in order to relieve any impingement of bone on the cord.  The second part of the posterior-approach surgery was to install two titanium rods with screws into the bone to correct misalignments of the spine and to fuse and stabilize the lumbar spine.

88.     Plaintiff followed these surgeries with an acute rehabilitation program and months of physical therapy.

89.     Neither the surgical procedures, nor the rehabilitation and physical therapy regimens that followed, have relieved Plaintiff from her pain, which she suffers in measure equal to, if not greater than, before.  As a result, Plaintiff remains disabled and unable to perform any type of work.

**PLAINTIFF'S CAUSE OF ACTION**
**FOR BREACH OF INSURANCE CONTRACT**

90.     Plaintiff repeats each and every allegation contained in paragraphs 1 through 89 as if set forth fully herein.

91.     The Policy, which provided disability benefits to Plaintiff as a group participant prior to May 23, 2005, remains in existence.

92.     Plaintiff performed all eligibility requirements and conditions precedent under the Policy, and was entitled to benefits upon showing that the she was unable to work.  Defendant admitted that Plaintiff met her obligations by approving her benefits on July 8, 2003.

93.     Defendant failed to perform its contractual obligations under the Policy by terminating Plaintiff's benefits on May 23, 2007, despite knowing that it lacked legitimate grounds for doing so because Plaintiff continued to satisfy her contractual obligations.  By using Dr. Taylor to provide preordained support for CIGNA's decision to deny or terminate benefits, CIGNA acted in bad faith.

94.     Defendant knew or should have known that its bad faith termination of Plaintiff's benefits would result in financial hardship to her, and it was foreseeable that she might have to relocate to a place with a lower cost of living.

95.   CIGNA's termination was morally reprehensible and so wantonly dishonest as to imply a criminal indifference to civil obligations because it knew that its decisions were not premised upon the terms and definitions of the Policy, were not supported by the medical evidence, and were not supported by the vocational evidence.

CIGNA's egregious conduct was not only directed against Plaintiff, but is part of a pattern directed against the Public as well.

96.  Plaintiff was and remains disabled within the terms and conditions of the Policy; therefore, Plaintiff is entitled receive monthly LTD benefits from May 23, 2005 to the present, along with monthly pension contributions.

97.  As Plaintiff was and remains disabled within the terms and conditions of the Policy; Plaintiff is entitled to continued coverage at the benefit level in effect at the time of her disability under the Policy adjusted for the proper reduction of Other Income Benefits.

98.  As a result of Defendant's bad faith breach of contract, Plaintiff is entitled to consequential damages in addition to the monthly disability and pension benefits.

**PLAINTIFF'S CAUSE OF ACTION
FOR VIOLATION OF GENERAL BUSINESS LAW**

99.  Plaintiff repeats each and every allegation contained in paragraphs 1 through 98 as if set forth fully herein.

100.  CIGNA willfully, knowingly or recklessly engaged in conduct that is deceptive and misleading in a material respect, including without limitation, engaging in

a deceptive practice and pattern of terminating valid disability claims, and that conduct is aimed at the general public as well as Plaintiff.

101    CIGNA, which has a common law obligation and statutory prohibition against engaging in deceptive acts and practices in the conduct of its business, is engaged in consumer-oriented conduct within New York State.

102.    CIGNA profited by terminating Plaintiff's benefits by engaging in deceptive acts and practices in violation of section 349 of the General Business Law.

.

103    Plaintiff has been injured by reason of CIGNA's deceptive practices, including loss of her monthly disability benefits, loss of her monthly pension contribution, and the loss of her home, and Plaintiff is entitled to reimbursement and restitution of all sums that Plaintiff lost and CIGNA gained as a result of its deceptive acts and practices.

104.    As a result of CIGNA's willful and knowing deceptive acts and practices, Plaintiff is entitled to three times her actual damages up to $1,000.00.

105.    As a result of Defendants' deceptive acts and practices, Plaintiff is entitled to an award of reasonable attorney fees.

106.   Plaintiff demands a jury trial of all claims.

**WHEREFORE,** Plaintiff respectfully requests this Court to:

On the First Cause of Action:

A.   Declare and determine that under the terms of the Policy Plaintiff's disability did not end on May 23, 2005, and that she continues to be disabled under the Policy;

B.   Declare and determine that under the terms of the Policy Plaintiff's pension contribution coverage continues during the period of Plaintiff's disability;

C.   Order CIGNA to compensate Plaintiff for her monthly disability benefits in accordance with the terms of the Policy,

D.   Order CIGNA to compensate Plaintiff for her monthly pension benefit contribution;

E.   Order CIGNA to compensate Plaintiff for her consequential losses;

On the Second Cause of Action:

F.     Declare that CIGNA's deceptive practices violate GBL §349 and resulted in Plaintiff losing her monthly disability benefits, her monthly pension contribution, and her home,

G.     Order that CIGNA must compensate Plaintiff for three times the amount of those losses up to $1,000; and

H.     Order  CIGNA to pay Plaintiff an award of reasonable attorney fees.

Dated:  Jericho, NY
        March 10, 2008

                              LAW OFFICES OF JEFFREY DELOTT

                    By:     _____
                            Jeffrey Delott, Esq. (JD8688)

                            Attorneys for Plaintiff
                            366 North Broadway
                            Suite 410
                            Jericho, NY  11753
                            (516) 939-2999